**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
Sheldon L. Pollock
Rebecca Reilly
Alexander Vasilescu
Todd Brody
Jeremy Brandt (pending admission *pro hac vice*)
Michael DiBattista
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-0080 (Brody)
brodyt@sec.gov

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                                 **Plaintiff,**<br><br>                      -against-<br><br>NANOBIT LIMITED, RADIANT HORIZONS LIMITED, SWEET KARMA FASHION INC., ZHAO TROPICAL DELI INC., JIAJIE LIU, FEI LIAO, and HUA ZHAO,<br><br>                                 **Defendants.** | <u>**COMPLAINT**</u><br><br>24 Civ. 6517 (    )<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("SEC" or the "Commission"), for its Complaint against NanoBit Limited ("NanoBit"), Radiant Horizons Limited ("Radiant Horizons"), Sweet Karma Fashion Inc. ("Sweet Karma Fashion"), Zhao Tropical Deli Inc. ("Zhao Tropical Deli"), Jiajie Liu ("Liu"), Fei Liao ("Liao"), and Hua Zhao ("Zhao") (collectively, "Defendants"), alleges as follows:

## SUMMARY

1. This case involves a relationship investment scam perpetrated by a complex web of known and unknown individuals and entities ("Scheme Participants") located in the U.S. and abroad to defraud U.S.-based investors by contacting targets seemingly at random, gaining their trust, and then manipulating them into transferring their assets and funds before disappearing with the stolen investment proceeds.

2. From at least September 2023 to June 2024, (the "Relevant Period"), NanoBit, by and through its unknown officers and/or managers and Scheme Participants, engaged in a coordinated scheme to defraud at least 18 investors out of approximately $967,835 in combined crypto assets and fiat currency.

3. Scheme Participants attracted investors by posing as financial industry professionals in WhatsApp groups, and slowly gained their trust by providing advice about finance and investing. They then encouraged investors to put their money into NanoBit's crypto asset trading platform ("the NanoBit Platform"), which gave investors the appearance that they were trading crypto assets and making profits. But the NanoBit Platform's interface was a mirage; in reality, no transactions took place on the NanoBit Platform. When investors attempted to withdraw their profits, the Scheme Participants disappeared.

4. On the Nanobit Platform, NanoBit claimed that a NanoBit affiliate, NanobitUS Securities, was registered as a broker with the Commission and was also affiliated with other reputable financial industry entities. Those claimed registrations and affiliations were false.

5.      To receive and misappropriate crypto assets, NanoBit coordinated with Scheme Participants controlling three unhosted[1] crypto addresses. During the Relevant Period, those three addresses received approximately $725,335 in crypto assets from NanoBit investors.

6.      To receive and misappropriate fiat currency, NanoBit coordinated with Liu (and the entity she controlled, Radiant Horizons), Liao (and the entity he controlled, Sweet Karma Fashion), and Zhao (and the entity he controlled, Zhao Tropical Deli). During the Relevant Period, these individuals (collectively, the "Money Mule Defendants") and the entities they controlled (collectively, the "Entity Defendants") received $242,500 from NanoBit investors and misappropriated that money by, among other things, spending it in the United States and wiring it to Hong Kong.

## VIOLATIONS

7.      By virtue of the foregoing conduct and as alleged further herein, NanoBit violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8.      By virtue of the foregoing conduct and as alleged further herein, the Entity Defendants and Money Mule Defendants violated Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. § 77q(a)(1), 15 U.S.C. § 77q(a)(3)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and Rule 10b-5(c) thereunder [17 C.F.R. § 240.10b-5(a), 17 C.F.R. § 240.10b-5(c)].

9.      Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions,

---

[1] An unhosted address or wallet is not hosted by a financial institution or third-party crypto platform, allowing the address or wallet owner to conceal illicit activities like those described this Complaint.

3

and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10. The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

11. The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) permanently enjoining Defendants from participating, directly or indirectly, in the purchase, offer, or sale of any security, or engaging in activities for purposes of inducing or attempting to induce the purchase, offer, or sale of any security by others provided, however, that such injunction shall not prevent Defendants Liu, Liao, and Zhao from purchasing or selling securities for their own personal accounts; (c) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (d) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and (e) ordering any other relief the Court may deem just and proper.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

13. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

14. Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)],

Exchange Act Section 27 [15 U.S.C. § 78aa]. Defendants Zhao and Zhao Tropical Deli may be found in, are inhabitants of, or transact business in the Eastern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including that at least one NanoBit investor resides in the District.

## DEFENDANTS

15. **NanoBit Limited**, incorporated in 2023 in Colorado, has its principal place of business in Boulder, Colorado. NanoBit's officers and/or managers are unknown.

16. **Radiant Horizons Limited**, incorporated in 2023 in California, has its principal place of business in Los Angeles, California. Its controller and beneficial owner is Jiajie Liu.

17. **Sweet Karma Fashion Inc.**, incorporated in 2020 in Nevada, has its principal place of business in Las Vegas, Nevada. Its controller and beneficial owner is Fei Liao.

18. **Zhao Tropical Deli Inc.**, incorporated in 2023 in New York, has its principal place of business in Amityville, New York. Its controller and beneficial owner is Hua Zhao.

19. **Jiajie Liu**, age 28, resides in Los Angeles, California. Jiajie Liu is the controller and beneficial owner of Radiant Horizons Limited and signatory on its bank accounts.

20. **Fei Liao**, age 29, resides in San Gabriel, California. Fei Liao is the controller and beneficial owner of Sweet Karma Fashion Inc. and signatory on its bank accounts.

21. **Hua Zhao**, age 26, resides in Flushing, New York. Hua Zhao is the controller and beneficial owner of Zhao Tropical Deli Inc. and signatory on its bank accounts.

## FACTS

I. **NanoBit, Through Scheme Participants, Solicited Investor Funds through its Fake Trading Platform**

   A. **Scheme Participants Impersonated Financial Professionals**

22. Beginning in or about October 2023, Scheme Participants solicited NanoBit

investors to join at least seven (7) WhatsApp groups[2] whose focus was investment advice purportedly provided by experienced financial professionals. In each case, Scheme Participants impersonated financial professionals and their assistants.

23. For example, in or about October 2023 a NanoBit investor ("Investor A") saw an advertisement on Instagram to join a WhatsApp group about finance and investments called VIP8012. The group was led by the purported Managing Director and Head of Global Research and Investment Strategy at a global investment firm ("Pseudo-Director A"). While there is, in fact, an individual with that name working at that firm, Pseudo-Director A is not that person.

24. Pseudo-Director A recommended trades in equity securities. Pseudo-Director A's recommendations were also touted by his purported assistant (also purportedly an employee at the global investment firm) and other group members believed to have been Scheme Participants. Investor A took Pseudo-Director A's advice, trading in his own brokerage account.

25. Additionally, in or about October 2023 another NanoBit investor ("Investor B") was placed in a WhatsApp group about finance and investing called VIP34 without her consent. The group was led by the purported Managing Director of a different investment firm ("Psuedo-Director B"). Like Psuedo-Director A, Psuedo-Director B impersonated a real financial professional.

26. Pseudo-Director B also recommended trades in equity securities, which were touted by his purported assistant and other group members believed to have been Scheme Participants.

### B. NanoBit, Through Scheme Participants, Promoted Trading on the NanoBit Platform

27. In or about November 2023, having cultivated false rapport with investors, Scheme Participants promoted crypto asset trading as a way for investors to generate significant returns.

---

[2] WhatsApp is an instant messaging platform in which a user's account is associated with a cellular mobile telephone number. It supports group messages in which phone numbers can be added or removed by the group administrator.

6

Both Psuedo-Director A and Psuedo-Director B recommended that investors create accounts and place trades on the NanoBit Platform (previously available at NanoBitUS.com). As an incentive, Scheme Participants told investors that through NanoBit's rewards program, investors would receive money with which to trade just by logging into their NanoBit account on a regular basis. Thus, investors were able to try trading on the NanoBit Platform with the free rewards money purportedly provided to the investors by NanoBit.

28. Scheme Participants holding themselves out to be NanoBit customer support representatives sent a link to the NanoBit Platform to NanoBit investors in the WhatsApp groups, along with, in some cases, NanoBit's Colorado incorporation documents and Certificate of Good Standing.

29. When investors, including Investor A and Investor B, clicked the link to the NanoBit Platform, they were presented with an interface which purported to offer trading in dozens of crypto assets, and which mimicked the features and functionality of a legitimate trading platform.

30. For example, as shown in the screenshot below from the NanoBit Platform, it displayed real-time price information for various crypto assets. The NanoBit Platform also gave the appearance of being able to facilitate purported crypto asset transactions and gave investors the ability to view their account balances.



*Sample User Interface Display of the NanoBit Platform*

31. In reality, there is no evidence that a crypto asset trading platform existed and no evidence that any transactions were executed on the NanoBit Platform.

32. The NanoBit Platform ostensibly made available for trading certain crypto assets that were offered and sold as investment contracts, and thus securities, as set forth in § D, below.

33. In addition, as shown in the screenshot from the NanoBit Platform below, NanoBit represented—both through its purported customer support representatives on WhatsApp and on the "About Us" page on the NanoBit Platform—that its purported affiliate, NanobitUS Securities, was registered as a broker with the Commission, was a member firm of the Securities Investor Protection Corporation ("SIPC"), and was affiliated with NASDAQ, the CBOE, and Apex Clearing Corp. All of those claims were false.

> NanobitUS Securities is a licensed securities broker in the United States, registered with the U.S. Securities and Exchange Commission (SEC). A member of the EDGX stock exchange under NASDAQ and CBOE.
>
> As a member firm of SIPC, SIPC insures each investor's NanobitUS Securities account up to $500,000 (of which $250,000 in cash). NanobitUS Securities' clearing service provider, Apex Clearing Corp, purchased additional commercial insurance for NanobitUS Securities. The insurance provides securities and cash protection of up to USD 150 million for NanobitUS Securities accounts, and each investor's NanobitUS Securities account enjoys up to USD 37.5 million in securities and USD 900,000 in cash. Similar to the Securities Investor Protection Corporation (SIPC) policy, this additional commercial insurance does not protect investors from loss of value in the securities market.
>
> NanobitUS Securities adopts leading technology to ensure the security of investors' personal information and asset data.

*"About Us" Page on the NanoBit Platform*

**C.      NanoBit, Through Scheme Participants, Directed Investor Funds into Bank Accounts Controlled by the Money Mule Defendants and Directed Investor Crypto Assets to Addresses Controlled by Scheme Participants**

34.     Investors began logging on to the NanoBit Platform and ostensibly trading crypto assets using the money they received through NanoBit's rewards program. After seeing their account balances rise due to their apparently profitable trading on the NanoBit Platform, investors began investing their own money. To facilitate their investments, Scheme Participants purporting to be NanoBit customer support representatives sent investors WhatsApp messages with account information for bank accounts held by the Entity Defendants along with instructions on how to wire money to them. Investors were told that these businesses served as "acceptors" who would convert fiat currency into crypto assets and place them in the investors' accounts. While providing no such service on behalf of investors, each of the Entity Defendants (controlled by the Money Mule Defendants) received funds from NanoBit investors.

35.     For example, after thinking he had profitably traded crypto assets on the NanoBit Platform using money earned through NanoBit's rewards program, on or about December 21, 2023, Investor A sent $1,000 to a Radiant Horizons bank account at Bank A ending in -4168 (the "Radiant Horizons Bank A Account"). The signatory on that Radiant Horizons Bank A Account was Defendant Liu.

9

36.     Each NanoBit investor who set up an account on the NanoBit Platform could see a crypto address associated with their NanoBit account, and they were told that these were their unique, dedicated addresses for trading crypto assets on the NanoBit Platform, such that they could transfer crypto assets such as Ether (ETH), Tether (USDT), and USD Coin (USDC) directly to their NanoBit address from other crypto asset trading platforms. In reality, as the Defendants knew or recklessly disregarded, the addresses provided to investors were used by Scheme Participants to pool and misappropriate investors' crypto assets.

37.     For example, Pseudo-Director A's purported assistant told Investor A that the address displayed on his profile on the NanoBit Platform was his personal address. However, the address displayed to Investor A on the NanoBit Platform was 0x72f28B6E6Fe33571276e37413540E0EB9b9CD4E3 (the "NanoBit Receiver Address") which, as described below, was used to pool and misappropriate multiple NanoBit investors' crypto assets in connection with the scheme.

**D.     NanoBit, Through Scheme Participants, Promoted Fake Initial Coin Offerings ("ICOs")**

38.     To solicit larger investments, Scheme Participants promoted in WhatsApp groups various so-called "ICOs" purportedly available only on the NanoBit Platform, promising substantial returns to investors. Two of those ICOs were Cosmic Energy (EGYG) and VTrade (VTRD), which Scheme Participants knew or recklessly disregarded were entirely fake.

39.     NanoBit, through Scheme Participants, knowingly or recklessly provided investors with fake whitepapers for EGYG and VTRD, which were downloadable on the NanoBit Platform. Those whitepapers described how funds raised through EGYG and VTRD would be used to develop other crypto asset trading platforms. But as Scheme Participants knew or recklessly disregarded, neither fictional asset, nor the platforms they purported to develop, existed.

40.     For example, on or about January 2, 2024, Pseudo-Director A touted to investors in

10

VIP8012 the offering of EGYG with a "profit target" of 1,000% and profits of at least $10,000 on an investment of $8,000.

41. On or about January 3, 2024, Investor A wired $10,000 to a Zhao Tropical Deli bank account at Bank B ending in -3308 (the "Zhao Tropical Deli Bank B Account") to purchase EGYG. The signatory on the Zhao Tropical Deli Bank B Account was Defendant Zhao. On January 4, 2024, Investor A sent another $9,500 to the same account.

42. Investor A received the wire instruction via WhatsApp from a purported NanoBit customer support representative.

43. Investor A's NanoBit account, in turn, reflected that he held 1,020 EGYG tokens on January 3, 2024, and another 999.6 EGYG tokens on January 4, 2024.

44. Similarly, on or about January 16, 2024, Psuedo-Director B touted to investors in VIP34 the offering of VTRD saying, "[a]fter a thorough analysis of future market trends, we believe that VTRD has the potential to appreciate by as much as 1000% - 2000%. In other words, your investment may achieve a 10x or 20x growth in the near future, with low risk and high returns." Psuedo-Director B sent direct messages to Investor B saying, "I won't let you lose if you really want to work with me. [… E]ven if the final profit does not meet your expectations I can compensate you."

45. On or about January 17, 2024, Psuedo-Director B recommended that his followers purchase or "subscribe" to the VTRD ICO so that they could collectively make profits or "winnings." He said that the group should "concentrate the subscription funds, and expand our subscription winning rate." Psuedo-Director B sent a direct message to Investor B saying, "[i]magine you buy VTRD for 2USDT [sic] now, and when it hits 20USDT [sic] then your account will be

multiplied 10 times."[3]

46. On or about January 18, 2024, Investor B wired $56,000 to a Sweet Karma Fashion bank account, in order to purchase VTRD. The signatory on the bank account was Defendant Liao.

47. Investor B received the instruction to transfer the funds to this account from a Scheme Participant purporting to be a NanoBit customer support representative.

48. Subsequently, Investor B's NanoBit account reflected 96,885.7184 VTRD tokens held in her account.

### E. NanoBit, Through Scheme Participants, Prohibited Withdrawals and Removed Disgruntled Investors from WhatsApp Groups

49. Investors attempting to make significant account withdrawals from the NanoBit Platform were met with excuses coupled with demands for additional fees.

50. For example, on or about March 4, 2024, Investor A attempted to make a withdrawal from his account on the NanoBit Platform and received an error message saying, "User failed to withdraw currency."

51. On or about March 4, 2024, Investor A sent WhatsApp messages to Scheme Participants purporting to be NanoBit customer support representatives for assistance in completing the withdrawal, and he was told by those Scheme Participants that he owed $10,962 in "Ghana miners fees," which would have to be paid with additional funds (not his NanoBit account balance) before his withdrawal could be processed. When Investor A questioned these fees in a direct message with Pseudo-Director A, Psuedo-Director A attempted make Investor A feel guilty for his skepticism, saying, "Sir, I have been doing everything I can to help people change their lives. What you are doing now makes me very sad. Makes me wonder if I'm doing the right thing by helping everyone."

---

[3] Generally, 1 USDT is equal to 1 USD.

52. On or about March 11, Investor A—still unsatisfied—pointed out in the VIP8012 WhatsApp group that these fees were not disclosed in advance and accused NanoBit of fraud. A likely Scheme Participant purporting to be an investor in the VIP8012 WhatsApp group tried to assuage Investor A's concerns by claiming that he was able to withdraw $1 million after paying the miner's fee. When Investor A doubled down, saying that NanoBit is not a legitimate business, he was promptly removed from the group. Other NanoBit investors were removed from their respective WhatsApp groups in a similar fashion when they demanded that NanoBit process the withdrawal of their account balances from the NanoBit Platform.

## II. Entity Defendants and Money Mule Defendants Misappropriated Investors' Funds, Sending Substantial Portions to Hong Kong

53. The Money Mule Defendants and Entity Defendants knowingly or recklessly misappropriated investor funds.

54. During the Relevant Period, Radiant Horizons sent over $2 million in foreign wires to bank accounts in Hong Kong held by various self-described trading companies and software companies incorporated in Hong Kong. These wires ranged in amount from $69,400 to $268,598, and they were sent almost immediately upon receipt of likely investor funds.

55. For example, on or about January 17, 2024, Radiant Horizons wired $145,690 from the Radiant Horizons Bank A Account to a bank account in Hong Kong held by a Hong Kong business entity. The $145,690 was comprised of $10,000 received from Investor A on or about January 16, 2024, $50,000 received from another NanoBit investor ("Investor C") also on or about January 16, 2024, and additional funds from other likely defrauded investors. Investor A and Investor C had wired those funds in order to purchase EGYG, which was offered and sold as a security on the NanoBit Platform.

56. Additionally, on or about January 18, 2024, $127,638 was wired from the Radiant Horizons Bank A Account to a bank account in Hong Kong held by a Hong Kong business entity.

The $127,638.00 was comprised of $13,000 from Investor B on or about January 17, 2024, and additional funds from other likely defrauded investors. Investor B had wired those funds in order to purchase VTRD, which was offered and sold as a security on the NanoBit Platform.

57. The Money Mule Defendants also knowingly or recklessly used investor funds in the bank accounts they controlled for personal expenses. For example, a debit card tied to the Radiant Horizons Bank A Account—which received approximately $99,000 from known NanoBit investors in or about December 2023 and January 2024—was used to make a $1,678 purchase on or about February 1, 2024, and a $1,239 purchase on or about February 5, 2024, with a charter plane operator. These two purchases were among over $6,500 in debit card purchases associated with the account, including concert tickets and meal delivery. There were also approximately $4,500 in ATM withdrawals from the Zhao Tropical Deli Bank B Account.

58. The Money Mule Defendants and Entity Defendants knew or recklessly disregarded that the funds belonged to investors. For example, on January 16, 2024, the Radiant Horizons Bank A Account received a $40,000 wire transfer from a likely investor with the memo line "INVESTMENTS." On January 17, 2024, that account also received a $10,000 wire transfer from another likely investor with the memo line "NANOBITSUS" [sic].

59. Over the course of four days between January 2, 2024, and January 5, 2024, Zhao Tropical Deli (ostensibly a grocery store) received $188,633.70 in nondescript incoming wire transfers from individuals.

### III. Crypto Addresses Controlled by Scheme Participants Misappropriated Investors' Crypto Assets, Sending them to Unhosted Crypto Addresses

60. In addition to the misappropriation of investors' fiat currency that was sent by investors to the bank accounts of the Entity Defendants, NanoBit, through Scheme Participants, knowingly or recklessly used three crypto addresses to misappropriate investors' crypto assets:

    i. 0x72f28B6E6Fe33571276e37413540E0EB9b9CD4E3 (the NanoBit Receiver

Address)

ii. 0xAbcFc3c81eE3e912d8feeA8044F17897b23aA836 (the "NanoBit Deployer Address")

iii. 0x580c86d925D8F03F4Aa7cf35FA5E00d6ba9E2926 (the "Transmitter Address")

61. During the Relevant Period, the NanoBit Receiver Address received approximately $445,486 in crypto assets (a combination of ETH, USDT, and USDC) from addresses belonging to NanoBit investors.

62. The NanoBit Deployer Address facilitated the creation of 19 other addresses which, during the Relevant Period, together with the Deployer Address collectively received approximately $279,849 in crypto assets from addresses belonging to NanoBit investors.

63. Certain of those crypto assets were transferred by investors in order to purchase EGYG and VTRD, which were offered and sold as securities on the NanoBit Platform.

64. For example, between January 22, 2024 and February 5, 2024, Investor C transferred approximately $42,500 in USDC from his crypto address at Robinhood.com to in order to purchase VTRD.

65. Both the NanoBit Receiver Address and the NanoBit Deployer Address sent NanoBit investors' assets (a combined $725,335) to the Transmitter Address.

66. Scheme Participants pooled NanoBit investors' crypto assets in the Transmitter Address with crypto assets likely obtained through other fraudulent activities.

67. The Transmitter Address was flagged on available law enforcement tools for its involvement in another crypto asset scam, and that address was used to transact a total of approximately $7.2 million in crypto assets.

68. In or about June 2024, the NanoBit Platform was taken down.

69. While some investors received small transfers of crypto assets after requesting

15

withdrawals on the NanoBit Platform, these transfers were likely a means for Scheme Participants to legitimize the scheme and assuage investors' concerns. Ultimately, none of the NanoBit investors were able to withdraw their full account balances as displayed on the NanoBit Platform.

70. The Proposed Defendants appear to be part of a larger group engaging in ongoing frauds of a similar nature perpetrated by Scheme Participants.

### IV. The Fictitious Tokens Purportedly Available for Trading on the NanoBit Platform were Offered and Sold as Securities

71. NanoBit investors sent money and crypto assets to purchase EGYG and VTRD, and those investors' account balances on the NanoBit Platform reflected that the fake purchases took place.

72. Investors who purchased EGYG and VTRD invested in a common enterprise. As described in the whitepapers that were provided to investors on the NanoBit Platform, funds raised by EGYG and VTRD's issuers through the ICOs were purportedly being pooled for the purpose of building out their respective platforms/projects. Those whitepapers described the crypto assets as fungible, such that all of the investors' investments rose or fell equally depending on the success of the project, and *pro rata* proportional to each investors' holdings of the assets.

73. Investors purchasing EGYG and VTRD were led—by representations in the whitepapers and the Scheme Participants' promotions in WhatsApp chats—reasonably to expect that the issuers would develop crypto asset trading platforms and that investors would enjoy astounding returns based upon these efforts.

74. EGYG and VTRD were offered and sold as passive investments, and investors had no use for these purported crypto assets other than as speculative investments to be sold on the NanoBit Platform for a profit, as encouraged by Scheme Participants.

16

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**
**(NanoBit)**

75. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 74.

76. NanoBit, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

77. By reason of the foregoing, NanoBit, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Violations of Securities Act Sections 17(a)(1) and 17(a)(3)**
**(Money Mule Defendants and Entity Defendants)**

78. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 74.

79. The Money Mule Defendants and Entity Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business

which operated or would operate as a fraud or deceit upon the purchaser.

80. By reason of the foregoing, the Money Mule Defendants and Entity Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. § 77q(a)(1), 15 U.S.C. § 77q(a)(3)].

### THIRD CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (NanoBit)

81. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 74.

82. NanoBit, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

83. By reason of the foregoing, NanoBit, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### FOURTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and 10b-5(c) Thereunder
### (Money Mule Defendants and Entity Defendants)

84. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 74.

85. The Money Mule Defendants and Entity Defendants, directly or indirectly, singly or

in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud and/or (ii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

86. By reason of the foregoing, the Money Mule Defendants and Entity Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and Rule 10b-5(c) thereunder [17 C.F.R. § 240.10b-5(a), 17 C.F.R. § 240.10b-5(c)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining the Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. §§ 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

**II.**

Prohibiting Defendants from (i) participating, directly or indirectly, in the purchase, offer, or sale of any security, or (ii) engaging in activities for purposes of inducing or attempting to induce the purchase or sale of any security by others, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)]; provided, however, that such injunction shall not prevent Defendants Liu, Liao, and Zhao from purchasing or selling securities for their own personal accounts;

### III.

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; and

### IV.

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

### V.

Granting any other and further relief this Court may deem just and proper.

### JURY DEMAND

The Commission demands a trial by jury.

Dated: New York, New York
September 17, 2024

_____
ANTONIA M. APPS
REGIONAL DIRECTOR
Sheldon L. Pollock
Rebecca Reilly
Alexander Vasilescu
Todd Brody
Jeremy Brandt (pending admission *pro hac vice*)
Michael DiBattista
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-0080 (Brody)
brodyt@sec.gov